Shiyong Ye
Matthew Sava
Matthew Livingston
REID & WISE LLC
One Penn Plaza, Suite 2015
New York, New York 10119
Tel: (212) 858-9968
sye@reidwise.com
sava@reidwise.com
mlivingston@reidwise.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| LIHUA GAN, PU GAO, YASHU LI, RUIMIN LIU, NA TANG, KAIQIN WANG, WEISHAN WEN, XINGQIN WEN, DONG YAN, SIYUN YAN, XINLIN YANG, JINCHUN LI, GUOYONG MA, AND LIJUAN YANG<br><br>*Plaintiffs*<br><br>v.<br><br>GSUIG REAL ESTATE MEMBER LLC, WEBSTER BANK, N.A. F/K/A STERLING NATIONAL BANK, EMPIRE OUTLET MANAGEMENT, LLC, BFC PARTNERS, LLC<br><br>*Defendants* | Case No. 24-cv-04234<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

## FIRST AMENDED COMPLAINT

Plaintiffs, by their undersigned counsel, Reid & Wise LLC, hereby allege upon personal knowledge, unless where indicated upon information and belief, for their complaint against GSUIG Real Estate Member LLC ("GSUIG"), Webster Bank, N.A. (f/k/a Sterling National Bank ("Webster Bank"), Empire Outlet Management, LLC ("EOM") and BFC Partners, LLC ("BFC" or "Developer" and, collectively with GSUIG, Webster Bank, and EOM, "Defendants"), as follows:

1

# NATURE OF THE ACTION

1. Plaintiffs bring this action to vindicate their rights as EB-5 investors in the failed Empire Outlets Mall (& Hotel)[1] project (the "Project") located on Staten Island in the State of New York. Plaintiffs are fourteen (14) foreign investors who each invested $500,000 (plus a $50,000 administrative fee) (the "EB-5 Investments") in non-party New York State Empire Outlet Fund I, LLC (the "EB-5 Lender"), an investment vehicle formed to provide financing for the Project. The Project was developed by BFC and financed through, *inter alia*, a combination of senior loans provided by Defendants GSUIG and Sterling Bank (now Webster Bank) and an EB-5 loan provided by Plaintiffs and other foreign nationals who provided financing through the EB-5 Program, the foreign investment program administered by United States Immigration and Citizenship Services ("USCIS").

2. Although Plaintiffs knowingly put their EB-5 Investments "at risk" as required by the EB-5 Program, Plaintiffs did not agree to forfeit any hope of financial recovery on their EB-5 Investments due to the self-serving and collusive actions of Defendants. Defendants not only knowingly and illegally colluded amongst themselves to ensure no recovery for Plaintiffs or other EB-5 investors in the Project, but continued to draw EB-5 money into the doomed Project once it was apparent to all parties that there was no hope of financial recovery for Plaintiffs or other EB-5 investors. Finally, as their coup de grâce against the EB-5 investors, GSUIG and Webster recently acquired the Empire Outlets mall property through a foreclosure sale in which they credit bid $10 million for the Empire Outlet assets—assets which were appraised at $390 million by Cushman and Wakefield during construction—and thereby

---

[1] Although Plaintiffs were led to believe their $500,000 EB-5 investments would be used to construct both an outlet mall and a hotel as complementary assets included in an integrated project, the hotel was never constructed on the Empire Outlets property. *See* PPM, p. 17. ("The Mall. . . and Hotel are deeply integrated components of the Project. . . and neither the Mall or Hotel would be expected to generate the same level of cash flow without the other.")

2

1 extinguished any hope of non-litigation recovery for Plaintiffs.

3. As a result, Plaintiffs bring this action to recover damages from Defendants for Defendants' nearly decade-long campaign to treat Plaintiffs and other EB-5 Investors as the free money or "dumb money" in the Empire Outlets project—the investors who should simply be happy to get their green cards while the Defendants collected interest on loans at interest rates of up to 20% and acquired the Project assets for pennies on the dollar. Plaintiffs, to prevent this unlawful and inequitable outcome, bring this action to recover the funds that are currently improperly lining the pockets of Defendants.

4. Plaintiffs, Chinese nationals at the time that they each made their investment, collectively provided more than $7 million in financing to the Project through investments in the EB-5 Lender. Overall, more than 150 EB-5 investors in the project contributed nearly $75 million to the Project.[2] As a result of the recent Foreclosure Sale, Plaintiffs have now been informed that the EB-5 Lender, and therefore Plaintiffs, will not recover any amounts in connection with their investments in the Project. Therefore, Plaintiffs each suffered specific and easily quantifiable damages of at least $500,000 as a result of the full loss of each Plaintiff's $500,000 investment in the Project via the EB-5 Lender.

## PARTIES

5. Plaintiffs Lihua Gan, Pu Gao, Yashu Li, Ruimin Liu, Na Tang, Kaiqin Wang, Weishan Wen, Xingqin Wen, Dong Yan, Siyun Yan, XinlinYang, Jinchun Li, Guoyong Ma, and Lijuan Yang are citizens of China. They each signed a Subscription Agreement (the "<u>Subscription Agreement</u>") and provided $500,000 (plus a $50,000 administrative fee) to acquire limited membership interests and become Limited Members in the EB-5 Lender entity, New York State Empire Outlet Fund I, LLC.

---

[2] Plaintiffs reserve the right to amend the Complaint to include other EB-5 investors with similar claims against all Defendants in the future.

3

6. Defendant GSUIG Real Estate Member LLC is a Delaware limited liability company with its principal place of business at 200 West Street, New York, NY 10282.

7. Defendant Webster Bank, N.A. is a Connecticut bank with its principal place of business at 19 Summer Street, Stamford, CT 06905. It is the successor-in-interest to Sterling National Bank, the original entity providing senior loan financing along with GSUIG to the Project.

8. Defendant Empire Outlet Management, LLC is a Colorado limited liability company with its principal place of business at 300 W. 6th St., Suite 1810, Austin, Texas 78701.

9. Upon information and belief, Defendant BFC Partners LLC is a New York limited liability company with its principal place of business at 150 Myrtle Avenue, Suite 2, Brooklyn, NY 11201. It is the developer of the Project.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as each Plaintiff is a foreign national and each defendant is a citizen of a United States state, with an amount in controversy exceeding $75,000.00.

11. Venue is proper in the Eastern District of New York because a substantial part of the acts or omissions giving rise to the claims occurred in this district, as the Project which is the subject of this dispute was a construction project on Staten Island, Richmond County, New York, a county within the jurisdiction of the Eastern District of New York.

## FACTUAL BACKGROUND

**A. The EB-5 Program**

12. The capital for the EB-5 Loan at issue did not come from any Defendant, including the Developer or Senior Lenders. Rather, the capital was provided by foreign investors including Plaintiffs under the U.S. government's EB-5 immigrant visa program (the

4

"EB-5 Program").[3]

13. Generally, a business that seeks to raise funds through the EB-5 Program will form a new commercial enterprise, such as the EB-5 Lender here, and will solicit foreign investors seeking to immigrate to the United States to become investors in such new commercial enterprise.

14. After the EB-5 investors subscribe to become limited members and make the required investment, they file a Form I-526 Immigration Petition for Entrepreneur ("I-526 Petition") with USCIS to show, based on a business plan and supporting documents submitted by the partnership, that the investment will satisfy EB-5 requirements. *See* 8 U.S.C. § 1153(b)(5); 8 C.F.R. § 204.6(a), (j). Upon approval of the I-526 Petition, USCIS will grant the investor conditional permanent residency, often known as a "conditional green card." 8 U.S.C. § 1186 b(a)(1).

15. Within two years after receiving a conditional green card, the investor must file with USCIS a Form I-829 Petition by Entrepreneur to Remove Conditions on Permanent Resident Status to prove that the investor satisfied the investment and job creation requirements of the EB-5 Program, at which time the investor's green card becomes permanent. 8 U.S.C. § 1186b(c); 8 C.F.R. § 216.6(a) and (c).

**B. The Initial Solicitation Materials**

16. In connection with raising capital from foreign investors under the EB-5 Program, the EB-5 Lender and/or one or more other entities affiliated with the Developer prepared and issued offering documents to the EB-5 Investors, including, but not limited to, the *Private Placement Memorandum*, dated September 2, 2014 (as supplemented and

---

[3] The EB-5 program, administered by USCIS permits qualified foreign investors to obtain immigration visas and to apply for green cards if they invest in certain commercial enterprises that meet certain qualifications, including, but not limited to, the creation or preservation of at least ten (10) jobs per investor. (*See generally* www.uscis.gov/eb-5.)

5

amended, the "PPM") and the *Comprehensive EB-5 Business Plan*, dated December 17, 2012 (as supplemented and amended, the "Business Plan").[4]

17. The PPM ultimately stated that the EB-5 Lender would offer 350 units at a subscription price of $500,000 per unit for a total net proceeds to the EB-5 Lender entity of up to $175,000,000.00. *See* PPM, at iii. Consequently, with a $50,000.00 administrative fee per Unit, the 350 units sold would raise $17,500,000.00 in administrative fees.

18. Significantly, the PPM also provided that EOM would be entitled to receive an "annual management fee equal to three percent (3%) of the outstanding principal amount of the Loan . . ." (the "Management Fee"). *See* PPM, at iii. The PPM provided that the Management Fee would be paid quarterly in arrears "to the extent funds are available" and would be paid "only from available cash flow of the Company, and will not be paid out of the proceeds from the Subscription Price." *Id*. If the EB-5 Loan was outstanding in the full amount of $175,000,000.00 and funds were available, such management fee would total $5.25 million per year.

## C. The Relevant Contracts

19. On May 1, 2014, the EB-5 Lender, EOM and a number of EB-5 investors, including Plaintiffs, entered into that certain *Operating Agreement of New York State Empire Outlet Fund I, LLC* (the "Operating Agreement"). The Operating Agreement sets forth, *inter alia*, the rights, obligations and duties of EOM and the EB-5 Investors vis-à-vis the investment in the Project. A copy of the Operating Agreement is set forth at Exhibit 1.

20. On September 2, 2014, the EB-5 Lender, via the PPM, offered for subscription up to $175,000,000 of Limited Membership Units in the EB-5 Lender for a purchase price of $500,000 per Unit.

---

[4] The PPM, Business Plan and various other communications between the Defendants and the EB-5 Investors were marked "confidential" and therefore have not been included as exhibits with this Complaint but can be filed under seal or redacted as necessary.

6

21. The EB-5 Loan was made pursuant to a Building Loan Agreement dated as of December 14, 2014, (as amended from time to time, the "EB-5 Building Loan Agreement"). A copy of the EB-5 Building Loan Agreement is attached hereto as Exhibit 2. The EB-5 Loan was secured by, *inter alia*, a second priority mortgage on the fee interest in the Project property and all improvements thereon (the "Collateral").

22. Substantially concurrently with the execution of the EB-5 Building Loan Agreement, the EB-5 Lender, GSUIG and the EB-5 Borrower entered into that certain Subordination and Intercreditor Agreement, dated as of December 11, 2014 (the "Original Subordination Agreement"). Pursuant to the Original Subordination Agreement, the EB-5 Loan was to be subordinated to the Senior Loans, but only up to an amount equal to $185 million *less* the outstanding amount of the EB-5 Loan, subject to certain exceptions as set forth more fully in the Original Subordination Agreement.

23. Subsequent to the execution of the EB-5 Building Loan Agreement, GSUIG agreed to provide the EB-5 Borrower with a loan in the initial aggregate principal amount of up to $135,000,000.00 pursuant to a Building Loan Agreement and Project Loan Agreement dated as of November 16, 2016, as amended (the "GSUIG Building Loan Agreement").

24. Sterling Bank, as a predecessor-in-interest to Webster Bank, N.A., also agreed to provide the EB-5 Borrower with a loan in the initial aggregate principal amount of up to $50,000,000.00 pursuant to a Building Loan Agreement dated April 14, 2017, as amended (the "Sterling Senior Loan Agreement" and, together with the GSUIG Building Loan Agreement, the "Senior Loans").

25. On December 11, 2014, GSUIG insisted that a Subordinate Loan Servicing Agreement be executed by GSUIG, the EB-5 Lender and the EB-5 Borrower (as amended, the "Servicing Agreement"). The Servicing Agreement provided, *inter alia*, that GSUIG would act as administrator and servicer of disbursements of the EB-5 Loan during the construction of the

7

Project. The Servicing Agreement was subsequently amended as of October 23, 2017.

**D. The 2016 Revised Business Plan & Project Appraisal**

26. On May 6, 2016, a revised Business Plan (the "2016 Business Plan") was published and ultimately disseminated to the EB-5 Investors, including Plaintiffs.

27. The 2016 Business Plan provided, *inter alia*, that "Initially, the Mall and Hotel were to be constructed simultaneously, captured in a 36 month timeframe. However, the Developer is now focused on construction of the Mall, with the Hotel construction to follow once the Mall is substantially complete in late 2017. 2016 Business Plan, at 9.

28. In addition, on November 15, 2016, Cushman & Wakefield provided an appraisal to GSUIG or its affiliates providing that the market value of the Project as of October 14, 2016 would be "nominal," but that with the improvements upon the Project property, the Project would be valued at $345,000,000.00 upon completion of construction as of November 1, 2017 and would be valued at $390,000,000.00 upon "stabilization" as of November 1, 2018. A copy of the Cushman & Wakefield 2016 appraisal is attached hereto at Exhibit 3.

**E. The 2019 Refinancing & Subordination**

29. On February 22, 2019, GSUIG, BFC and non-party JLL solicited third-party bridge financing related to the Project through a confidential offering memorandum.

30. On March 4, 2019, GSUIG, Sterling National Bank, the EB-5 Lender and the EB-5 Borrower entered into that certain Amended and Restated Subordination and Intercreditor Agreement (the "2019 Subordination Agreement"). A copy of the 2019 Subordination Agreement is attached hereto as Exhibit 4.

31. Pursuant to the 2019 Subordination Agreement, the EB-5 Lender agreed to further subordinate itself to additional senior loans in an amount not to exceed $57 million. 2019 Subordination Agreement, at ¶E.

32. Upon information and belief, the additional $57 million in senior loans were

8

extended to the EB-5 Borrower at an APY of 20%.

33. None of the EB-5 Investors were informed of the EB-5 Lender's entry into the 2019 Subordination Agreement until after the 2019 Subordination Agreement was executed.

34. At the time it entered into the 2019 Subordination Agreement, the EB-5 Lender had no contractual obligation to further subordinate the EB-5 Loan to the Senior Loans.

35. The consideration provided to the EB-5 Lender to enter into the Subordination Agreement was grossly inadequate. A consent fee of $500,000 was effectively a payoff of $500,000 by the Senior Lenders for a near certainty of no recovery on the outstanding EB-5 Loan amount.

36. At the time the Subordination Agreement was entered into, GSUIG, Webster and EOM knew that the consideration provided to the EB-5 Lender as the "consent fee" was grossly inadequate as the purported "consideration" for the full subordination of the EB-5 Loan.

37. Upon information and belief, GSUIG and Webster knew that the EB-5 Investors had not consented to the Subordination Agreement. EOM certainly knew that the EB-5 Investors had not consented to the Subordination Agreement, as it never requested such consent from the EB-5 Investors.

38. GSUIG, Webster and EOM knew that the Subordination Agreement was detrimental to the EB-5 Lender and would directly benefit GSUIG and Webster.

39. EOM's agreement to subordinate the EB-5 Loan constituted misconduct and a breach of EOM's common law and contractual fiduciary duty to Plaintiffs insofar as it directly resulted in the full loss of each Plaintiff's capital. Specifically, EOM had a duty to "perform its duties as a Manager in good faith and with that degree of care which an ordinary prudent person in like position would use under similar circumstances." Operating Agreement, §4.5. Agreeing to further subordinate the EB-5 Loan was a breach of this duty and directly caused

9

Plaintiffs' damages. While Plaintiffs were not guaranteed a full recovery of their investments in the Project, the actions of Defendants in further subordinating the EB-5 Loan via the 2019 Subordination Agreement all but guaranteed the total loss of Plaintiffs' capital invested in the Project. If instead EOM and the other Defendants had not further subordinated the EB-5 loan, various more beneficial outcomes were possible and even likely, including, *inter alia*, (i) a foreclosure sale to a third party buyer in 2019 or subsequent years resulting in a recovery on the EB-5 Loan, (ii) third party refinancing with less onerous interest rate terms or extended maturity dates resulting in stabilization of the project; or (iii) an in court or out-of-court restructuring in which the EB-5 Loan received some recovery or equity position in the Project.

**F. Project Failure & Loan Defaults**

40. The outlet mall portion of the Project officially opened to the public on May 16, 2019. The hotel portion of the Project was never constructed.

41. On February 18, 2020, GSUIG sent a Notice of Default to the EB-5 Borrower. On April 17, 2020, Sterling Bank, as predecessor-in-interest to Webster sent a Notice of Default to the EB-5 Borrower. On April 21, 2020, the EB-5 Lender sent a Notice of Default to the EB-5 Borrower.

42. On May 4, 2020, the EB-5 Lender wrote a letter to the EB-5 Investors (the "May 2020 Letter") outlining the performance of the Project to date, including the total amount of EB-5 Loan funds loaned to the Project and certain "operational struggles" of the Project, including an "operating loss for 2020" and "a capital shortfall of approximately $25 million needed to fund current and future tenant improvements." May 2020 Letter, at 1. The May 2020 Letter stated that the Developer had informed the EB-5 Lender that it "intends to ask all lenders to enter into a forbearance period on loan interest and to restructure the capital stack of the project." *Id.* The EB-5 Lender concluded that the "financial returns on the EB-5 Loan are likely materially in jeopardy and there is an increasing chance that the NCE [EB-5 Lender]

may face a total loss on the EB-5 Loan." *Id*.

**G. The Foreclosure Sale & Plaintiffs' Complete Loss of EB-5 Investments**

43.  On February 11, 2022, GSUIG filed a foreclosure action complaint in New York State Supreme Court, Richmond County, Index No. 150270/2022, seeking to foreclose (purportedly on consent) on the collateral securing the Senior Loans (and EB-5 Loans) for the Project (the "Foreclosure Action").

44.  On April 27, 2022, the EB-5 Lender filed its Answer, Counterclaim and Cross Claim, objecting to certain aspects of the Foreclosure Action. Foreclosure Action, ECF No. 110.

45.  After briefing, on December 27, 2022, the Foreclosure Action court entered an order dismissing the EB-5 Lender's Answer, Counterclaim and Cross-Claim. Foreclosure Action, ECF No. 295.

46.  A foreclosure sale auction was conducted on September 21, 2023 (the "Foreclosure Sale") at which the collateral securing the Senior Loans and EB-5 Loan was sold to Defendants GSUIG and Webster via a credit bid of the outstanding Senior Loans for total consideration of $10,000,000 (the "Foreclosure Sale Price"). *See* Referee's Report of Sale, Foreclosure Action, ECF No. 336.

47.  The Foreclosure Sale was approved by the Foreclosure Action court via order entered on March 19, 2024. Foreclosure Action, ECF No. 350.

48.  As a result of the Foreclosure Sale, the EB-5 Lender's lien on the collateral was extinguished as a matter of law.  The EB-5 Lender will therefore receive no recovery on the EB-5 Loan and, as a result, Plaintiffs and the other EB-5 Investors in the project will receive no recovery on their investments in the Project, absent this litigation.

## CAUSES OF ACTION

### COUNT 1 – BREACH OF FIDUCIARY DUTY (AGAINST EOM)

49. Plaintiffs hereby incorporate all of the foregoing and subsequent paragraphs as if alleged herein.

50. EOM, as the Special Member under the Operating Agreement, owes fiduciary duties to the EB-5 Investors as Limited Members under the Operating Agreement, and is obliged to treat the latter with the utmost candor, rectitude, care, loyalty, and good faith. There is no elimination of fiduciary duties owed by the Special Member to the Limited Members within the Operating Agreement.

51. The decision by EOM to enter into, on behalf of the EB-5 Lender and therefore the EB-5 Investors, the Subordination Agreement, cannot be justified by any standard of care because it was completely apparent at the time of the decision that such actions would cause very substantial deterioration to the EB-5 Lender's rights as a secured creditor without any corresponding benefit to the EB-5 Lender.

52. The conduct of EOM, and the individuals making decisions for it, was committed with gross negligence and beyond the bounds of reason.

53. EOM did not ask for the consent of, or even inform, the EB-5 Investors prior to entering into the 2019 Subordination Agreement.

54. As a result of entry into the 2019 Subordination Agreement, the EB-5 Lender became subordinated to the Senior Loans in an additional amount of $57 million and the EB-5 Investors ultimately lost the full amount of their investments.

55. The wrongful conduct of EOM was willful, wanton, malicious, oppressive, and outrageous, and justifies an award of punitive damages in an amount sufficient to punish Defendants and deter future conduct of this type.

### COUNT 2 – AIDING & ABETTING BREACH OF FIDUCIARY DUTY (AGAINST GSUIG, WEBSTER BANK & BFC)

56. Plaintiffs hereby incorporate all of the foregoing and subsequent paragraphs as if alleged herein.

57. Each of GSUIG, Webster and BFC knew that EOM owed fiduciary duties of care and loyalty to the EB-5 Investors.

   a. BFC knew because it orchestrated the entire arrangement to obtain EB-5 financing for the development of the Project and was involved in the formation of the EB-5 Lender.

   b. GSUIG & Webster knew because they each reviewed the loan documents relating to the EB-5 Loan, which sets forth that EOM is the Special Member of the EB-5 Lender. Moreover, GSUIG and Webster are both parties to the Subordination Agreement, which would have required further diligence on the EB-5 Loan and the fiduciary duties owing to the EB-5 Lender by EOM.

58. Each of GSUIG, Webster and BFC provided substantial assistance to EOM in its breach of fiduciary duties because each party coordinated with EOM to execute the Subordination Agreement, with GSUIG specifically enriching itself to the detriment of the EB-5 Investors through the additional Senior Loans bearing a 20% interest rate.

59. The participation of GSUIG, Webster Bank and BFC in EOM's breach of fiduciary duties, as well as their acceptance of the benefits thereof, was a substantial factor in causing harm to the EB-5 Lender and the EB-5 Investors. As a result, the EB-5 Investors have lost the full value of their investments.

60. The wrongful conduct of GSUIG, Webster and BFC in aiding and abetting EOM's breach of its fiduciary duties to the EB-5 Lender was willful, wanton, malicious, oppressive, and outrageous, and justifies an award of punitive damages in an amount sufficient to punish Defendants and deter future conduct of this type.

## COUNT 3 – BREACH OF CONTRACT

**(AGAINST EOM FOR BREACH OF OPERATING AGREEMENT)**

61. Plaintiffs hereby incorporate all of the foregoing and subsequent paragraphs as if alleged herein.

62. Section 4.5 of the Operating Agreement provides that, in performing its responsibilities:

> the Manager shall perform its duties as a Manager in good faith and with that degree of care which an ordinary prudent person in like position would use under similar circumstances.

63. EOM, as the Special Member & Manager of the EB-5 Lender, failed to act in good faith when it, *inter alia*, failed to protect the interests of the EB-5 Lender as a secured creditor.

64. The conduct of EOM constitutes, at minimum, gross negligence and/or willful misconduct within the contractual language of section 4.5.

65. Moreover, under the Operating Agreement, there exists an implied covenant of good faith and fair dealing that required EOM not to take an action that would detrimentally harm the EB-5 Lender in exchange for no valuable consideration to the EB-5 Lender.

66. EOM breached this implied covenant of good faith and fair dealing by entering into, on behalf of the EB-5 Lender, the 2019 Subordination Agreement.

67. As a result, the EB-5 Investors have lost the full value of their investments.

68. The wrongful conduct of EOM was willful, wanton, malicious, oppressive, and outrageous, and justifies an award of punitive damages in an amount sufficient to punish Defendants and deter future conduct of this type.

**COUNT 4 – TORTIOUS INTERFERENCE WITH CONTRACT**
**(AGAINST GSUIG, WEBSTER BANK & BFC FOR INTERFERENCE WITH OPERATING AGREEEMENT)**

69. Plaintiffs hereby incorporate all of the foregoing and subsequent paragraphs as if

14

alleged herein.

70. The Operating Agreement constitutes a contract between (i) EOM, as the Special Member, and (ii) the EB-5 Investors, as the limited members.

71. Each of the Defendants except EOM was aware of the Operating Agreement and tortiously interfered with the Operating Agreement to the significant financial detriment of Plaintiffs.

72. Each of Defendants other than EOM intended to or designed to disrupt the Operating Agreement, including, but not limited to, section 4.5 thereof, which requires the Special Member to perform its duties in good faith and with that degree of care which an ordinary prudent person would use under similar circumstances." Operating Agreement, §4.5.

   a. Each of the Defendants other than EOM intended to or designed to disrupt the Operating Agreement in order to facilitate a self-dealing transaction by causing the EB-5 Lender to be subordinated for the purpose of permitting the EB-5 Borrower to obtain additional financing under the Senior Loans in order for the Project to generate short term returns for the Senior Lenders and eliminate any chance of recovery for the EB-5 Investors.

   b. GSUIG and Webster intended to or designed to disrupt the Operating Agreement in order to generate profits and fees under the Senior Loans and to further subordinate the EB-5 Loan to the Senior Loans.

73. As a result, the EB-5 Investors lost the full value of their investments in the EB-5 Lender.

74. The wrongful conduct of GSUIG, Webster and BCF was willful, wanton, malicious, oppressive, and outrageous, and justifies an award of punitive damages in an amount sufficient to punish Defendants and deter future conduct of this type.

### COUNT 5 – CIVIL CONSPIRACY TO BREACH FIDUCIARY DUTY
### (AGAINST ALL DEFENDANTS)

15

75. Plaintiffs hereby incorporate all of the foregoing and subsequent paragraphs as if alleged herein.

76. Defendants are party to a conspiracy to breach EOM's fiduciary duty to Plaintiffs.

77. There was an agreement between the Defendants to do an unlawful act or to do a lawful act by unlawful means; there were overt acts in furtherance of the conspiracy; Plaintiffs were each damaged as a result of acts done under the conspiracy.

78. The basis of the conspiracy is the reckless waste of more than $75 million in EB-5 Investors' money, including at least $7 million of Plaintiffs' monies. The overt act of each Defendant was the negotiation and entry into the 2019 Subordination Agreement, an agreement which financially benefitted each of the Defendants and directly resulted in damages to Plaintiffs in the amount of no less than $500,000 each.

79. Defendants acted with the full knowledge and awareness that by subordinating the EB-5 Loan to the Senior Loans—while continuing to collect management fees in the case of EOM or Senior Loan interest payments at 20% APY in the case of the Senior Lenders—they would eliminate any chance of the EB-5 Investors' to recover on their investments in the Project.

80. There was a meeting of the minds of each Defendant in furthering the conspiracy, as specifically demonstrated through the negotiation of the 2019 Subordination Agreement without the consent or knowledge of Plaintiffs or any other EB-5 Investor.

81. As a result of these overt actions by each Defendant, EOM breached its common law and contractual fiduciary duties to Plaintiffs and each Defendant should be held liable for

such damages as a knowing participant in such conspiracy to breach said fiduciary duties.

### COUNT 6 – CIVIL CONSPIRACY TO BREACH CONTRACT
### (AGAINST ALL DEFENDANTS)

82. Plaintiffs hereby incorporate all of the foregoing and subsequent paragraphs as if alleged herein.

83. Defendants are each a party to a conspiracy to breach the Operating Agreement by EOM.

84. There was an agreement between the Defendants to do an unlawful act or to do a lawful act by unlawful means; there were overt acts in furtherance of the conspiracy; Plaintiffs were each damaged as a result of acts done under the conspiracy.

85. There was a meeting of the minds of each Defendant in furthering the conspiracy, as specifically demonstrated through the negotiation of the 2019 Subordination Agreement, an agreement which financially benefitted each of the Defendants and directly resulted in damages to Plaintiffs in the amount of no less than $500,000 each.

86. The negotiation and entry into the 2019 Subordination Agreement resulted in a direct breach of the Operating Agreement by EOM, specifically including but not limited to a breach of section 4.5 (Duties of Manager) and likely section 5.5 (Management Fee) insofar as EOM continued to collect any Management Fees subsequent to entry into the 2019 Subordination Agreement.

87. As a result of these overt actions by each Defendant, EOM breached the Operating Agreement and each Defendant should be held liable for such damages as a knowing participant in such conspiracy to breach such contract.

### COUNT 7 – UNJUST ENRICHMENT
### (AGAINST EOM)

88. Plaintiffs hereby incorporate all of the foregoing and subsequent paragraphs as if

17

alleged herein.

89. EOM charged the EB-5 Lender a 3% per annum Management Fee of the total outstanding amount owed under the EB-5 Loan.

90. As a result of the EOM's collection of the Management Fee, EOM has received millions of dollars in management fees, while Plaintiffs and EB-5 Investors never received a single dollar of recovery on the amounts invested in the EB-5 Lender. While Plaintiff's do not dispute that EOM would have been contractually entitled to the Management Fee had it not breached the Operating Agreement, it was no longer entitled to collect any Management Fee's once it had breached the Operating Agreement by, *inter alia*, entering into the 2019 Subordination Agreement. Furthermore, EOM was entitled to collect the Management Fee "solely from funds received by the Company from the payment of the Loan." Operating Agreement, §5.5. Plaintiffs assert that any Management Fee received by EOM after 2019 was improper and should have been reserved for repayment of Plaintiff's investments in the EB-5 Loan.

91. As a result, EOM has been unjustly enriched while violating its fiduciary duties to the EB-5 Investors.

92. It is against equity and good conscience to permit EOM to retain these monies.

93. Plaintiffs seek the disgorgement and return of these funds.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the Defendants, and each of them, as follows:

1) For any and all economic damages in an amount to be determined at trial, which at the time are believed to be in excess of $7,000,000.00, which amount will increase if and when additional EB-5 Investor plaintiffs are added this this Complaint;

18

2) For punitive damages in an amount to be determined according to proof at trial;

3) Prejudgment and post-judgment interest at the legal rate on all damages and sums awarded to Plaintiffs;

4) Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all causes of action, claims, or issues in this action that are triable to a jury as a matter of right.

DATED: September 12, 2024

/s/ Matthew Sava

**REID & WISE LLC**
Matthew Sava
Shiyong Ye
Matthew Livingston (*pro hac vice* application forthcoming)
One Penn Plaza, Suite 2015
New York, NY 10119
Phone: (212) 858-9968
Fax: (516) 821-8978
sava@reidwise.com
sye@reidwise.com
mlivingston@reidwise.com